## McKEE v. CITY OF GRAND RAPIDS.

1. ADVERSE POSSESSION—EVIDENCE·—SUFFICIENCY—INTERLOCKING TITLES.

Where, in ejectment for part of an island in an inland river, it appeared that, for more than 20 years before suit, defendant and its grantors had been in the actual occupancy of portions of the island, and had had the exclusive use of the remainder for such purposes as occasion required,—*i. e.*, for fishing, grazing, recreation, the taking of ice, the holding of public exhibitions, and the disposition of garbage,—claiming to own the entire island, defendant's title was established by adverse possession, though, as to the land in controversy, its paper title interlocked with the earlier title of plaintiff, under which he was in possession of adjacent territory.

2. SAME—ISLANDS—ACCRETIONS.

As between one claiming an island in an inland river by adverse possession under color of title, and the owner of the adjacent mainland, accretions to the island made by dredging within a period of 15 years before suit belong to the owner of the island up to the original thread of the channel, and beyond that to the owner of the mainland.

Error to superior court of Grand Rapids; Newnham, J. Submitted January 16, 1903. (Docket No. 58.) Decided May 29, 1903.

Ejectment by James H. McKee and James Langdon McKee against the city of Grand Rapids. From a judgment for plaintiffs for a part of the land only, they bring error. Affirmed.

*Burlingame, Belden & Orton* and *William E. Grove* (*Knappen, Kleinhans & Knappen*, of counsel), for appellants.

*Moses Taggart* (*Taggart & Taggart*, of counsel), for appellee.

MOORE, J. This action is ejectment, involving title to certain portions of an island situated in Grand river known as "Island No. 3." The plaintiffs claim title to the land in controversy through a patent issued by the United States to Henry L. Ellsworth, bearing date November 5, 1833, and *mesne* conveyances to them. It is claimed by the defendant that the Ellsworth patent, and consequently the plaintiffs' title, extends only to the thread of the easterly channel of Grand river, as it now exists. The defendant claims title to Island No. 3 through a patent issued by the United States to Richard Godfroy, bearing date August 10, 1840, and *mesne* conveyances to the said defendant. Island No. 3 is situated in the easterly half of the river, and it is the claim of the plaintiffs that it was conveyed to Ellsworth by the government patent executed to him in 1833, which did not refer to the island, and that the subsequent survey and grant to Godfroy of Island No. 3 were void. This claim was sustained by the court below. The defendant also claimed title by adverse possession. The jury found this claim to be true, except as to a line 10 feet west of and parallel with the thread of the easterly channel of Grand river. The plaintiffs have brought the case here by writ of error.

It is the claim of the plaintiffs that the question of the legal title is settled in their favor by the case of *Butler*.v. *Railroad Co.*, 85 Mich. 246 (48 N. W. 569, 24 Am. St. Rep. 84). The defendant does not concede this claim, but says the decision in that case proceeded upon the theory that not only was the east bank of Grand river surveyed in 1831, but the west bank also, while in fact, as disclosed by the record in this case, the west bank and the islands in the river were not surveyed until 1837, when the islands and west bank of the river were surveyed and meandered, and that this was after the Ellsworth patent was issued, and before the Godfroy patent, and that, if this situation had been understood, the decision in the *Butler Case* would have been different. As before stated, the trial judge decided the question of legal title in favor of plaintiffs. For reasons which will hereafter appear, we do not deem it necessary to refer further to this question. A reference to the plats in *Butler* v. *Railroad Co.*, *supra*, will aid in understanding the situation and make it unnecessary to reproduce them here.

The city claims to be the owner of Island No. 3. The upper portion of this island is used as a market place. South of the center of the island, and on the west side thereof, the city has a substantial and expensive lighting plant. One of the descriptions of land for which this suit is brought extends easterly and westerly across the island north of this plant. Some distance south of the lighting plant the city has erected, at an expense of upwards of $10,000, a crematory for burning garbage. One of the descriptions of land for which this suit is brought runs easterly and westerly across the island between the lighting plant and the crematory. About midway between the crematory and the south end of the island a railroad bridge, which spans both channels of the river, crosses the island. This bridge was built in 1881, and has a driveway beneath it, where teams can pass under it, and reach the lower part of the island. The only way to reach the island by teams is near the north end, from Oakes street. It is the claim of plaintiffs that, as owners of lots on the mainland

which border on the east channel of Grand river, the lines
of their lots extend across the island to the thread of the
west channel of the river, while, as before stated, the city
claims title by reason of the Godfroy patent and adverse
possession.

The second question discussed by counsel for plaintiffs
relates to that part of the charge of the trial judge reading
as follows:

"A party's possession of a single parcel or tract of land
is co-extensive with his claim of title; that is, if his deed
is for an entire parcel of land, and he occupies a part,
either personally or by tenant, his possession extends to
the whole tract described in his deed or patent. If, there-
fore, you find that Alcott Caldwell was in possession of a
part of the island under lease of the whole, the possession
of the owners of the island, through him as their tenant,
would extend to the whole island, it being a single parcel
of land; and such possession would be adverse to the
whole world if such possession continued for 15 years, or
was continued through other tenants to make in the
aggregate 15 years."

It is the claim of counsel that as the Ellsworth patent
covered not only land on the east of the east channel, but
the south half of the island, while the Godfroy patent pur-
ported to convey the entire island, the question of inter-
locker is involved, and applies to the south half of the
island; and while Caldwell's occupancy, which will be
referred to later, would establish title to the north half of
the island, it would not do so as to that part of the island
covered by both patents.   Counsel say:

"The general rule is well settled that where a party
enters, under color of title, into the actual occupancy of a
part of the premises described in the instrument giving
color, his possession is not considered as confined to that
part of the premises in his actual occupancy, but he
acquires possession of all the lands embraced in the
instrument under which he claims.   This is true although
the land is not actually inclosed, and though the tract
may be divided into two parts by a river running through
it."

And as, under the Ellsworth patent, the grantee took possession of the land east of the channel, that this gave them constructive possession of the land on the island, and that this continued until they were ousted thereof by actual adverse possession.   Counsel also say:

"Where a person enters into land under a deed or title, his possession is construed to be co-extensive with his deed or title, and, although the deed or title may turn out to be defective or void, yet the true owner will be deemed disseised to the extent of the boundaries of such deed or title. This, however, is subject to some qualification; for, if the true owner be at the same time in possession of a part of the land, claiming title to the whole, then his seisin extends, by construction of law, to all the land which is not in the actual possession and occupancy, by inclosure or otherwise, of the party so claiming under a defective deed or title.   The reason is plain:  Both parties cannot be seised at the same time of the same land under different titles, and the law, therefore, adjudges the seisin of all which is not in the actual occupancy of the adverse party to him who has the better title."

In order to decide whether the court erred in its charge to the jury, it will be necessary to go into the facts as disclosed by the record more in detail.   Though the Ellsworth patent was issued in 1833, it does not appear that from that time until now any person claiming title thereunder was ever in actual occupancy of any portion of the island.   It should be borne in mind that, until some time about 1870, the island was entirely surrounded by water. The east channel, at an ordinary stage, between the island and the land covered by the Ellsworth patent on the mainland, was 4 to 6 feet deep, and by various witnesses is stated to have been from 75 to upwards of 200 feet wide.   As early as 1863 one Caldwell had a fishhouse on the upper end of the island, and claimed to have the right to control all of the island.   He used seines in his fishing operations, both at the north end, the south end, and the west side of the island.   He afterwards erected a building in which he built boats.   He kept what the witnesses called a "boat livery," keeping a large number of boats

for hire.   He erected an icehouse, and took ice from the channel east of the north end of the island.   He kept stock upon the island, which had the run of the island. He turned stock away which he claimed was trespassing on the island.   He claimed the exclusive right to fish from the shores of the island.   On the trial there was stated in the language of the record:

"Offered in evidence a tax history and records tending to show that Island No. 3 has been assessed subsequent to the patents from the United States government separate from the assessment of the mainland opposite thereto in Ellsworth addition, and that the taxes on Island No. 3 were paid by claimants under the chain of title from Richard Godfroy, while the taxes to the land opposite thereto, in Ellsworth addition, including the property of the plaintiffs, were assessed upon the same roll separately to parties claiming title in the line from Henry L. Ellsworth, under which the plaintiffs claim."

It was also shown that as early as June, 1855, James Miller and John T. Holmes obtained a quitclaim deed to the undivided half of Island No. 3, which deed was recorded the same month.   Mr. Caldwell claimed that he was in possession of the island under Miller and Holmes. In November, 1872, James Miller obtained a warranty deed of the undivided one-half of the island from John F. Godfroy and wife, which deed was put upon record the next day.   From this time on Mr. Miller claimed to be the owner of an undivided three-fourths of the island, and Mr. Holmes one-fourth.   A written lease dated April 30, 1874, from James Miller to Mr. Caldwell, of the island, was put in evidence.   Mr. Caldwell was to occupy it as a boat landing, for boats, boathouses, etc., and, in addition to a cash rent of $50, was to keep all trees on said island from damage, and see that no waste or depredations were committed.   Indorsements were made on this lease up to May, 1878.   Mr. Miller reserved to himself the right to use the island for shows, circuses, and public festivals.   A witness having charge of Mr. Miller's papers after his death says there were other written leases, which were

afterwards lost, of prior date to the one offered in evidence, and it was shown by the books of Miller that Caldwell paid rent to him as late as June, 1886. It was also shown that Caldwell remained upon the island, claiming to be the tenant of Miller and Holmes, until his death, in 1889. In August, 1881, the railroad company paid the Miller estate $375 for the right of way across the lower end of the island, and in the same month obtained deeds of the right of way from Mr. and Mrs. Holmes and from the heirs of Mr. Miller. At about the same time one of the plaintiffs sold to the same railroad company lots on the mainland to enable it to construct the bridge and its road-bed, and at once, after acquiring these deeds, the railroad company proceeded to construct its railroad across the island, bridging both channels of the river, and is now running its trains over said bridge and track.

As early as 1879 Miller and Holmes leased for money rent the right to cut ice along all the east shore of said island, except 10 rods south of Oakes street, for a period of five years. Ice was cut under this lease, and when it expired other leases of like character were made, and this continued as late as 1887, when one of the witnesses says the ice became unfit for use. For a portion of this time James H. McKee, one of the plaintiffs, made a lease, giving the right to cut ice east of the center of the east channel. As early as 1880 the Kent County Sportsmen's Club obtained from the Miller estate and Mr. Holmes, for a money rent, the right to put up a clubhouse, which was probably erected on the north half of the island. The club did target shooting once a week, to the south of the center of the island, shooting towards the railroad bridge, and the president of the club testified their shooting would extend over an area 30 rods square. This club used the island for this purpose for about 10 years. Before this there was a shooting butt near the railroad bridge, which was used by a militia company, which stood north of the butt when engaged in target practice. The Mohawk Club also had a lease of part of the island. As early as 1880

the city of Grand Rapids obtained from Miller and Holmes the right to use portions of the island for the purpose of dumping garbage. The wagons reached the island from Oakes street, and traveled almost every weekday nearly the whole length of the island, dumping a large portion of the garbage south of the railroad bridge, and continued to do this until the crematory was built. In the winter fewer loads were drawn, but in the summer there were frequently 30 to 50 loads a day. For a considerable portion of the time the city hired a man continuously to spread the garbage and direct where it should be deposited. Miller and Holmes let circuses and shows occupy portions of the island for a money rent. Their tents would cover a large portion of the south end. The island was not adapted to agriculture. The south portion of it could not be reached without using boats or swimming the river, except by passing over the north half of it.

The record discloses that Miller and Holmes and their tenants, from 1872, occupied not only the north half of the island, but also that portion of the island which is covered by the interlocker (so called), for all purposes for which any one had occasion to use it,—and they were many,—and occupied it claiming to be the owners of it. For more than 40 years before this suit was brought, the grantors of the city were in possession of the upper half of the island, and for 20 years were in actual occupancy of portions of the interlocker, claiming to be the owners of the entire island. Nineteen years before suit was brought a right of way was sold by them to a railroad company, and a massive railway bridge was constructed. The public must have known the grantors of the city were claiming title to the whole of the island. The case was not left within any of the exceptions to the general rule as stated in the charge of the judge. It would be difficult to imagine a case where title by adverse possession was more clearly established, where the land was not actually covered with buildings. Instead of leaving the question of adverse possession to the jury, the trial judge, under

the decisions of this court, would have been justified in directing a verdict in favor of defendant, except as to any lands added by reason of dredging the east channel. See *Clark* v. *Campau*, 92 Mich. 573 (52 N. W. 1026); *Henry* v. *Henry*, 122 Mich. 6 (80 N. W. 800), and the cases cited therein.

This brings us to the question of whether the court erred in his charge, and in his failure to give certain of the plaintiffs' requests, relating to the subject of accretions and relictions. The east channel was dredged in 1871 and at later times. It is claimed by plaintiffs that the water was diverted above the dredging, and that the earth lifted by the dredges was dumped along the center line of the east channel, and that as a result the east shore of the island was carried beyond the original thread of the east channel.

What we have said as to the effect of the possession of the island of those from whom the city gets title will make it unnecessary to discuss that portion of the charge relating to accretions and relictions which have existed more than 15 years. As to those which had not existed for 15 years the judge instructed the jury as follows:

"But if you find, gentlemen of the jury, that, as far as the island is concerned, the defendant has been in possession of the same adversely, but that the channel is narrower now than it was, and you should find that the narrowing of the same was not made by natural accretions to the land, and that the defendant had not been in adverse possession of the strip of land between what was then the west bank and the bank as it is now for a period of 15 years, then it will be for you to say how far from the east bank of the channel the plaintiffs are entitled to recover. * * *

"Should you find, under the rules that I have given you, that the plaintiffs are entitled to recover for any portion of the land which lies between what is known as the trees and the west bank of the channel, you will state in your verdict, 'We find for the plaintiffs, and fix the boundary line at ———', whatever number of feet you should happen to find it to be west of the west line of

Market street, regardless of whether it takes in the land or whether it does not take in the land on the west side of the channel.

"If you should find, as I say, that the defendant has not been in adverse possession of that strip for 15 years, and that it was not made by the natural accretions that I have spoken about, then it would be for you to fix the line where the center of the channel was, and render your verdict accordingly."

It was the claim of plaintiffs that as a result of the dredging at various times, and of the diversion of the water at the head of the island, the east channel had been very materially narrowed, and the area of the island had been very materially increased. It was the claim of the defendant that the channel was not materially narrowed. Testimony was offered in favor of these conflicting claims. It is evident from the verdict of the jury that they accepted in part the theory of the plaintiffs in this respect. We think the judge did not err in his statement of the law which should control this feature of the case.

Judgment is affirmed.

The other Justices concurred.